10-0372-cv
New York Civil Liberties Union v. New York City Transit Authority

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2010

Argued: December 16, 2010                    Decided: July 20, 2011
                            Amended: January 4, 2012

Docket No. 10-0372-cv

_____

NEW YORK CIVIL LIBERTIES UNION,

*Plaintiff-Appellee*,

– v. –

NEW YORK CITY TRANSIT AUTHORITY,

*Defendant-Appellant*,

H. DALE HEMMERDINGER, ELLIOT G. SANDER,

*Defendants*.

_____

Before: LEVAL, CALABRESI, LYNCH, *Circuit Judges*.

The New York City Transit Authority ("NYCTA") appeals from an order of the district court for the Southern District of New York (Sullivan, *J.*) enjoining the enforcement of an NYCTA policy requiring third parties to obtain the consent of those contesting notices of violation before NYCTA's Transit Adjudication Bureau in order to observe such hearings. We hold that the First Amendment guarantees the public a presumptive right of access to the NYCTA's adjudicatory proceedings, and that the NYCTA has not overcome that presumption.

Affirmed.

CHRISTOPHER DUNN, New York Civil Liberties Union Foundation, (Arthur Eisenberg, *on the brief*), New York, N.Y., *for Plaintiff-Appellee.*

RICHARD SCHOOLMAN, Office of the General Counsel, New York City Transit Authority, (Valerie K. Ferrier, *on the brief*), New York, N.Y. *for Defendant-Appellant.*

David A. Schulz, Jacob P. Goldstein, Levine Sullivan Koch & Schulz, LLP, New York, N.Y., *for Amici Curiae The New York Times Company, et al., in support of Plaintiff-Appellee.*

Brian Kreiswirth, Committee on Civil Rights, The Association of the Bar of the City of New York, Marjorie Lindblom, Evan Saucier, Kirkland & Ellis LLP, New York, N.Y. *for Amicus Curiae The Association of the Bar of the City of New York.*

CALABRESI, *Circuit Judge*:

Defendant-Appellant New York City Transit Authority ("NYCTA") promulgates Rules of Conduct ("Rules") for those who use the city's public transportation and its associated facilities. N.Y. Pub. Auth. Law § 1204(5-a); *see* N.Y. Comp. Codes R. & Regs. § 1050 *et seq.*[1] All New York City police officers are authorized to issue citations for violations of the Rules. *New York Civil Liberties Union v. New York City Transit Authority*, 675 F. Supp. 2d 411, 414 (S.D.N.Y. 2009) ("*NYCLU*"); *see* N.Y. Comp. Codes R. & Regs. § 1050.12. A police officer has discretion to issue either a summons to New York Criminal Court ("Criminal Court") or a notice of violation for the Transit Adjudication Bureau ("TAB"), a department in the NYCTA where an alleged Rule-breaker may contest the citation in an in-person hearing. *NYCLU*, 675 F. Supp. 2d at 414;

---

[1] The NYCTA is "municipal board and public-benefit corporation established by the laws of New York state," empowered to operate, maintain, and control public transit facilities in New York City. *New York Civil Liberties Union v. New York City Transit Authority*, 675 F. Supp. 2d 411, 413 & n.1, 2 (S.D.N.Y. 2009).

*see* N.Y. Pub. Auth. L. § 1209-a(3). In each forum, a neutral decisionmaker determines whether the alleged violator has broken a Rule and imposes a penalty for such violations.

When a person who is issued a summons contests the citation in court, that hearing is, by statute, open to the public. N.Y. Judiciary Law § 4 (stating that, absent exceptions not relevant here, "[t]he sittings of every court within this state shall be public, and every citizen may freely attend the same . . . ."). NYCTA policy, in contrast, excludes from a TAB proceeding any observer to whose presence the person contesting the notice of violation, or "respondent," objects.

Plaintiff-Appellee New York Civil Liberties Union ("NYCLU") brought suit under 42 U.S.C. § 1983 to enjoin this policy, claiming, *inter alia*, that the policy violated the NYCLU's First Amendment right of access to government proceedings.[2] The district court (Sullivan, *J.*) granted a preliminary, and then a permanent, injunction. *NYCLU*, 675 F. Supp. 2d at 439; *New York Civil Liberties Union v. New York City Transit Authority*, No. 1:09-cv-3595 (RJS) Doc. 39 (January 22, 2010), Doc. 40 (January 29, 2010). On appeal, the NYCTA claims that the public has no right of access to administrative adjudicatory proceedings generally and that, even if such a right exists, it should not apply to TAB hearings. We disagree.

The public's right of access to an adjudicatory proceeding does not depend on which branch of government houses that proceeding. To determine whether a particular adjudicatory forum should be presumptively open to the public, courts ask whether the forum has historically been open and whether openness enables its proper functioning. In

---

[2] Although the NYCLU argued below for a "federal common law" right of access, *see* 675 F. Supp. 2d at 423 n.20, it does not advance that theory on appeal as an alternative basis for affirming the district court's judgment. We accordingly deem the theory abandoned.

the present case, both lines of inquiry lead squarely to the same answer. We reach no broad conclusions about the openness required of administrative proceedings generally. But we conclude that the First Amendment guarantees the public a qualified right of access to the administrative adjudicatory forum at issue in this case, and that no grounds have been adduced by the NYCTA supporting its rules limiting that right. We therefore affirm.

## BACKGROUND

**I. The Transit Adjudication Bureau**

From 1966, when the Rules were first enacted, until 1986, when the TAB first began operating, the New York Criminal Court ("Criminal Court") had exclusive jurisdiction over citations for Rules violations. *NYCLU*, 675 F. Supp. 2d at 415. A 1984 statute created the TAB to lessen the burden on the Criminal Court and to increase the rate at which fines were collected from Rules violators. *See* N.Y. Pub. Auth. Law § 1209-a. The statute also increased the fine that could be imposed: while the Criminal Court is limited to a fine of no more than $25 for a violation of an NYCTA Rule, the TAB may fine a violator up to $100, with an additional penalty of up to $50 for failing to respond to a notice of violation. N.Y. Pub. Auth. Law § 1204(5-a); *see also NYCLU*, 675 F. Supp. 2d at 414. (The Criminal Court may also sentence a violator to a maximum of 10 days' imprisonment, *NYCLU*, 675 F. Supp. 2d at 414, but the record suggests that this penalty is rarely, if ever, imposed.)

The police officer citing the violation has discretion to choose whether to issue a citation to Criminal Court or a notice of violation to the TAB. As the district court observed, "no violation appears to be, by definition, only returnable to one of the

venues." *NYCLU*, 675 F. Supp. 2d at 415; *see* N.Y. Pub. Auth. Law § 1209-a(3) (giving the TAB "non-exclusive jurisdiction over violations of" the Rules).

A person who receives a TAB notice of violation may pay the fine without contesting it, contest it by mail, or contest it at an in-person hearing. In 2008, officers issued 125,155 notices of violation returnable to the TAB. That same year, 88,236 notices of violation were paid without contest, and 19,028 were contested at in-person TAB hearings. Attorneys appointed by the NYCTA President and paid on a per-diem basis preside over TAB hearings as TAB hearing officers. N.Y. Pub. Auth. Law § 1209-a(2).

The TAB can issue subpoenas, "accept pleas[,] . . . hear and determine . . . charges of transit infractions[,] . . . impose civil penalties[,] . . . [and] enter judgments and enforce them, without court proceedings, in the same manner as the enforcement of money judgments in civil actions." N.Y. Pub. Auth. Law § 1209-a(4)(a)-(e), (g). A final order issued by the TAB serves as a "bar to . . . criminal prosecution" for the same conduct. *Id.* 1209-a(9)(b). TAB guidelines provide that respondents may be represented by counsel. *NYCLU*, 675 F. Supp. 2d at 417; *see Guidelines Governing Proceedings Before the Transit Adjudication Bureau* § 1.7 ("*TAB Guidelines*").[3] Respondents may show up at the TAB office any time during the period stated on their notices of violation and receive a hearing on a first-come, first-served basis.[4] But if a hearing is scheduled by the TAB (as is sometimes done to facilitate the production of witnesses or evidence), the respondent must be told its date and location. *NYCLU*, 675 F. Supp. 2d at 417. Hearing officers identify the parties and issues in the case; advise respondents of their rights to a

---

[3] The NYCTA promulgates guidelines governing TAB proceedings pursuant to statutory authority. N.Y. Pub. Auth. Law § 1209-a(4)(d); *see NYCLU*, 675 F. Supp. 2d at 416 & n.7.
[4] The accusing officer's written notice serves as *prima facie* evidence of a violation. *TAB Guidelines* § 2.1.

hearing, representation, cross-examination, document production, and appeal; and oversee the presentation of motions, cases in chief, and rebuttals. *Id.* at 417-18. TAB guidelines govern the timing, formats, and procedures for filing documents, *id.* at 418, and specify that a Rules infraction must be established by clear and convincing evidence, with any affirmative defenses to be established by a preponderance of the evidence, *id.* Witnesses are sworn and exhibits may be introduced. *Id.* Respondents may appeal a hearing officer's decision to an internal appeals board and, from there, to state court. *Id.* at 419. The TAB is required by statute to "compile . . . complete and accurate records relating to all charges and dispositions." N.Y. Pub. Auth. Law § 1209-a(4)(f). In other words, in these and many other particulars, the TAB acts very much like a court of first instance.

At the same time, the TAB's powers and procedures are not the same as a court's. To enforce a subpoena that is not obeyed, the TAB "may make application to the [New York] supreme court." *Id.* § 1209-a(7)(e). Although a TAB final order "may be enforced without court proceedings in the same manner as . . . money judgments entered in civil actions," *id.* § 1209-a(9)(b), the TAB may need to "apply to a court of competent jurisdiction for enforcement of" such a decision, *id.* § 1209-a(4)(g). Most of the rules of evidence do not apply to TAB hearings, *id.* § 1209-a(7)(e), and no pre-hearing motions or discovery are permitted, *TAB Guidelines* §§ 2.3, 2.8. The notice of violation itself, without additional corroboration, is deemed *prima facie* evidence of a violation. *Id.* § 2.1. And, significantly, the records the TAB compiles on charges and dispositions are, by

statute, exempt from disclosure under New York's Freedom of Information Law. N.Y. Pub. Auth. Law § 1209-a(4)(f); *see* N.Y. Pub. Officers Law § 87.[5]

**II. The TAB's Access Policy**

The NYCTA describes its long-term access policy as one of presumptive openness to the public. Under that policy, a person who wishes to observe a TAB hearing must twice obtain the consent of the respondent whose case is being heard. If the respondent objects either time, the observer must be excluded from the hearing. A prospective observer must give TAB security personnel her name and inform them of her wish to observe a hearing. When the respondent is called, TAB officials are supposed to call the observer as well. The hearing officer, who meets respondents at the door leading to the hearing rooms, then asks the respondent if he objects to the observer's presence at the hearing. If the respondent objects, the observer may not enter. If the respondent does not object, the three proceed to a hearing room. There, the observer must state her name for the record, and the hearing officer again asks whether the respondent objects to the observer's presence. If he does not, the hearing can proceed. If the respondent does object to the observer's presence, the observer must leave before the hearing begins. TAB personnel do not ask why a respondent objects to an observer's presence and do not

---

[5] By statute, these records "shall be deemed exempt from disclosure under the [New York State] freedom of information law as records compiled for law enforcement purposes." N.Y. Pub. Auth. Law § 1209-a(4)(f). New York's Freedom of Information Law exempts records "compiled for law enforcement purposes" if their disclosure would lead to specific consequences, including interfering with law enforcement investigations, judicial proceedings, or the right to a fair trial; or revealing a confidential source, confidential criminal investigation information, or non-routine criminal investigative techniques or procedures. N.Y. Pub. Officers Law § 87(2)(e). The TAB statute does not specify which of these consequences TAB records implicate. New York's Freedom of Information Law also insulates records that "are specifically exempted from disclosure by state or federal statute." *Id.* § 87(2)(a). Whether the statutory exemption of TAB records from the Freedom of Information Law violates a presumptive right of access to government proceedings is not before us, and we do not address that question here.

attempt to evaluate the reason, significance, or propriety of the observer's presence. A respondent's objection by itself conclusively bars an observer from a hearing.

Although this policy was only put in writing in March 2009, after the NYCLU complained to the NYCTA about access to TAB hearings, Martin Schnabel, the NYCTA's vice president and general counsel, testified that the policy had been in place for many years as an unwritten practice. Mr. Schnabel also stated that the NYCTA Board and the Metropolitan Transit Authority played no role in adopting the access policy, which has not been formally promulgated as a rule. Instead, he testified, "the matter was discussed among . . . TAB personnel and Transit Authority legal personnel." But, he continued, the "ultimate judgment as to what the policy should be at this juncture is mine."

Mr. Schnabel stated his belief that "allow[ing] people to attend regardless of the wishes of the respondent may well have the effect of chilling the appearance of some percentage of respondents," who would feel their privacy so invaded by an open hearing as to lead them to decline to have a hearing at all. Mr. Schnabel explained that the rationale underlying the policy was preventing such a "chilling" effect on respondents who might otherwise avail themselves of the opportunity to contest their notices of violation, but who would do so in person only if they had the power to exclude third parties from their hearings.

Mr. Schnabel further testified that he had collected no evidence and conducted no studies on which he based his conclusion that open access would discourage respondents from  seeking TAB hearings. The NYCTA did submit a declaration from Debra Siedman DeWan, a long-time TAB hearing officer, who listed reasons respondents might "wish to

maintain [their] privacy when testifying." These included the existence of embarrassing medical conditions or other physical or mental illnesses; an inability to pay the fines; and the fear that a parent or a parole or probation officer would learn of the hearing.

**III. The NYCLU's Allegations**

According to its complaint, the NYCLU is an organization that advocates for "open governmental and judicial proceedings." As an example, the NYCLU submitted materials indicating that it had worked successfully to open hearings at the New York City Taxi and Limousine Commission to the public.

The NYCLU further asserts that it is "involved in advocacy about [New York City Police Department] policies and practices." For instance, the NYCLU has urged the New York City Police Department to ensure that officers know that bystanders are entitled to film and photograph police activity in public transit areas and advocated changes in the police department's public transit sting operations. The NYCLU has also investigated the demographic characteristics of those stopped and frisked by New York City Police Department officers on public transit, and concluded that minorities receive a disproportionate number of citations for Rule violations. These investigative and advocacy activities, the NYCLU alleges, give it "a particular interest in observing TAB hearings in which [New York City Police Department] officers testify."

The NYCLU also represents clients issued notices of violation. The NYCLU alleges that the inability to observe TAB hearing freely leaves it "seriously hampered in its ability to advise clients" about their own hearings. Finally, the NYCLU has asserted that it "plan[s] to promptly start monitoring TAB hearings" if the access policy is enjoined.

According to the NYCLU's complaint, law students working under the direction of an NYCLU attorney attempted to observe TAB hearings on several occasions. Some would-be observers were simply denied access to hearings without more. Security guards or hearing officers told them that observation was against the law, that the hearings are not open to the public, or just that they could not enter. Others were told they had to obtain a respondent's consent. On one occasion, on January 14, 2009, "[t]he head hearing officer denied the law student's request to observe a hearing *unless she could identify a consenting respondent*. This requirement prevented her from observing a hearing." On another occasion, on January 29, 2009, after having been told that observers were not permitted, a law student spoke to the head hearing officer who, recognizing the student, "offered to request a random individual's permission to let the student sit in on a hearing," which the student was allowed to do "[o]nce someone consented."

**IV. Proceedings Below**

The district court determined that TAB hearings are presumptively open under the First Amendment, and that therefore limits to access are subject to strict scrutiny. Since a respondent's objection conclusively bars a third party from observing a hearing and "respondents may object for any reason at all" to the presence of an observer, the district court held that the policy was not strictly tailored to a compelling governmental purpose, and specifically is not tailored to the NYCTA's stated purpose of preventing the chilling of respondents' willingness to contest their notices of violation in person. *NYCLU*, 675 F. Supp. 2d at 438-39.

Accordingly, the court granted the NYCLU's motion for a preliminary, and ultimately a permanent, injunction requiring the NYCTA to open TAB hearings to the

public absent "specific, on-the-record findings that closure of a proceeding is narrowly tailored to meet a higher governmental value." *Id.* at 439. The NYCTA appeals this decision, claiming that no presumptive right of access adheres to administrative adjudicatory proceedings. In the alternative, the NYCTA argues that, even if such a right attached to some administrative adjudicatory proceedings, it should not apply to the TAB. The NYCTA also challenges the NYCLU's standing to sue. For the reasons that follow, we affirm the district court.

## DISCUSSION

**I. Standards of Review**

We review a district court's grant of a preliminary injunction for abuse of discretion, which "occurs when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts." *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348 (2d Cir. 2003). "To obtain a preliminary injunction a party must demonstrate . . . that it will be irreparably harmed if an injunction is not granted." *Id.* at 348-49. For mandatory injunctions, which "alter rather than maintain the status quo," such as the one at issue here, "the movant must show a 'clear' or 'substantial' likelihood of success" on the merits. *Id.* at 349. The requirements for a permanent injunction are "essentially the same" as for a preliminary injunction, except that the moving party must demonstrate "actual success" on the merits. The district court is authorized to determine, as it did here, that the evidence before it suffices for that purpose. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). Our standard of review remains the same.

11

Whether a plaintiff has standing to sue is a question of law that we review *de novo*. *Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004).

**II. Standing**

To have standing, a plaintiff must demonstrate an "actual and imminent, not conjectural or hypothetical" threat of a "concrete and particularized" injury in fact that is "fairly traceable to the challenged action of the defendant" and that "a favorable judicial decision will [likely] prevent or redress." *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

An organization can have standing to sue in one of two ways. It may sue on behalf of its members, in which case it must show, *inter alia*, that some particular member of the organization would have had standing to bring the suit individually. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 511 (1975) (calling this approach "representational" standing); *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (calling it "associational" standing). In addition, an organization can "have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982) ("[O]rganizations are entitled to sue on their own behalf . . . ."). Under this theory of "organizational" standing, the organization is just another person—albeit a legal person—seeking to vindicate a right. To qualify, the organization itself "must 'meet[] the same standing test that applies to individuals.'" *Irish Lesbian & Gay Org.*, 143 F.3d at 649 (quoting *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)) (alteration in the original); *see also Nnebe v. Daus*, No. 09-4305-

cv, --- F.3d ----, 2011 WL 2149924, at *6-*7 (2d Cir. March 25, 2011, revised May 31, 2011) (confirming that "nothing prevents an organization from bringing a § 1983 suit on its own behalf so long as it can independently satisfy the requirements of Article III standing," and that "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact" satisfying the requirements of standing (internal quotation marks omitted)).

The NYCTA claims that the NYCLU lacks standing because it failed to identify any individual member of the NYCLU who currently has standing to challenge the TAB access policy. But as the district court explained in its lucid opinion, the NYCLU does not bring its challenge under an associational/representational theory of standing. Rather, it sues to vindicate its own rights as an organization with goals and projects of its own. *NYCLU*, 675 F. Supp. 2d at 425-26. As it does not sue on behalf of injured members, it need not identify any that have standing. The individuals described in the NYCLU's submissions as having attempted to observe TAB hearings are not listed because they are injured members of the organization. They are, instead, its agents or representatives, and it is the organization itself that claims injury.

The NYCTA also claims that the district court was wrong to conclude that the NYCLU's attempts to observe TAB hearings "have been frustrated in the past." *Id.* at 427. According to the NYCTA, NYCLU attempts to observe TAB hearings were blocked by misinformed individual employees acting "in violation of long-standing TAB policy." The NYCTA suggests that this problem was resolved once the access policy was written down and distributed.

The NYCTA is correct that, in order to have standing to challenge the TAB access policy, the NYCLU must establish that it (through its agents) suffered a concrete injury as a result of the policy. The NYCLU has done so. As discussed above, the NYCLU's complaint detailed an incident on January 29, 2009, during which the head hearing officer correctly applied the policy as written and excluded an NYCLU observer from a hearing until TAB personnel found a respondent who assented to the observer's presence. In addition, during an earlier visit on January 14, 2009, TAB personnel excluded an NYCLU representative from a hearing, telling the NYCLU representative (incorrectly) that it was her responsibility to find and identify a consenting respondent.

Although the NYCTA's official policy was misapplied during that January 14, 2009 visit, the deviation was so slight as to be immaterial for standing purposes. What NYCLU seeks to challenge is a policy by which respondents are permitted, for any reason or no reason at all, to exclude members of the public from TAB hearings. During the NYCLU's January 14, 2009 visit, TAB officials may have misconstrued the precise *manner* in which the respondent veto provision of the access policy was supposed to function. The constitutionally relevant point, however, is that the respondent was in fact given a veto over the observer's attendance. In any event, the exclusion caused by this misapplication of the policy was fairly traceable to the policy itself, which required TAB personnel to monitor the public's access to the hearing room on an ongoing basis. Accordingly, NYCLU has established that it suffered an actual injury—exclusion from at least some TAB hearings—as a result of the NYCTA's access policy.

This injury, in turn, is to a cognizable interest. The NYCLU has alleged an interest in open access to TAB hearings as a matter of professional responsibility to

14

clients. In order to represent clients before the TAB, NYCLU must prepare, in part, by observing TAB hearings. The NYCLU has shown that the access policy has impeded, and will continue to impede, the organization's ability to carry out this aforementioned responsibility.

Since the NYCLU has alleged a cognizable interest and both past and imminent injuries to it, we determine that the district court correctly found that the NYCLU has standing to bring its challenge. We therefore turn to the putative right of access on which that standing is based.

**III. The First Amendment Right of Access to Government Proceedings**

Courts and commentators have long recognized the centrality of openness to adjudicatory proceedings: "'Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.'" *In re Oliver*, 333 U.S. 257, 271 (1948) (quoting 1 Jeremy Bentham, Rationale of Judicial Evidence 524 (1827)). While the Sixth Amendment guarantees "the right to a . . . public trial" to "the accused," U.S. Const. amend. VI, the value of openness for the defendant has not always been strictly distinguished from its value to the public and to the adjudicatory proceeding itself. "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *In re Oliver*, 333 U.S. at 270. In *Oliver*, seemingly Sixth Amendment public access was seen as a guarantor of fairness, accuracy, and correct procedure—as much because these further democratic values and help adjudicators reach correct results as because they protect defendants.

15

The distinction in protected values was drawn clearly in *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368 (1979), which held that the Sixth Amendment guaranteed only the right of the accused to have his trial held before the public and did not protect the right of the public to observe the proceeding. A year later, however, a plurality of the Court found this *public* right to be "implicit in the guarantees of the First Amendment." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) (plurality opinion). It stated that "without the freedom to attend such trials, . . . important aspects of freedom of speech and of the press could be eviscerated." *Id.* (internal quotation marks and footnote omitted).[6] "Free speech," the plurality opinion noted, "carries with it some freedom to listen." *Id.* at 576.

The First Amendment's guarantees of freedom of speech and the press entail that "'the government [be prohibited] from limiting the stock of information from which members of the public may draw.'" *Id.* (quoting *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)). Public access to trials helps "give meaning to those explicit guarantees" of freedom of speech and the press—guarantees that protect the right "to speak and to publish concerning what takes place at a trial," and that "would lose much meaning if access to observe the trial could . . . be foreclosed arbitrarily." *Id.* at 575, 576-77.

As this implies, the First Amendment right of access to criminal trials is not absolute. It does not foreclose the possibility of *ever* excluding the public. What offends the First Amendment is the attempt to do so without sufficient justification.

---

[6] *Richmond Newspapers* did not produce a majority opinion, but seven of the eight Justices who participated agreed that the First Amendment, together with the Fourteenth, guaranteed a right of public access to criminal trials. Justice Powell, who did not participate in the decision in *Richmond*, had previously expressed this same view. *Gannett Co.*, 443 U.S. at 397 (Powell, *J.*, concurring); *see also Saxbe v. Washington Post Co.*, 417 U.S. 843, 850 (1974) (Powell, *J.*, dissenting).

This right, incidentally, is also consistent with the rights of the accused. As *Gannett* "made clear[,] . . . although the Sixth Amendment guarantees the accused a right to a public trial, it does not give [her] a right to a private trial." *Id.* at 580 (citing *Gannett*, 443 U.S. at 382). And the presumptive First Amendment right of access precludes a judge or a defendant, or both together, from *arbitrarily* closing a criminal proceeding.[7]

Justice Brennan's concurrence in *Richmond Newspapers* offered "two helpful principles" to guide courts in determining whether a qualified right of access attaches to a given government proceeding. *Id.* at 589 (Brennan, *J.*, concurring). First, courts should inquire into "experience" (history) and "consider[] whether the place and process have historically been open to the . . . public." *Press-Enterprise v. Superior Court*, 478 U.S. 1, 8 (1986) ("*Press-Enterprise II*") (internal quotation marks omitted). Second, courts should consider "logic" (functionality) and ask whether public access "plays a significant positive role in the functioning of the particular process in question." *Id.* Courts apply this experience and logic test to determine whether a qualified right of public access attaches to a given government forum. *See, e.g.*, *Globe Newspaper*, 457 U.S. at 605; *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 94-95 (2d Cir. 2004).

Reading *Richmond Newspapers* broadly, the Supreme Court has subsequently held that the First Amendment safeguards a qualified right of access not only to criminal

---

[7] Open access also serves larger purposes of accountability, legitimation, and democratic governance. Because "court rulings impose official and practical consequences upon members of society at large," a trial is "a genuine governmental proceeding" that is "pre-eminently a matter of public interest." *Id.* at 595-96. Public access "serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). In doing so, it has systemic effects not only on government proceedings but on perceptions of their legitimacy. Because public access allows "people not actually attending trials [to] have confidence that standards of fairness are being observed[,] . . . . [o]penness . . . enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508 (1984).

trials but to related proceedings such as witness testimony, *Globe Newspaper*, 457 U.S. at 608-10; the transcripts of *voir dire* proceedings, *Press-Enterprise v. Superior Court*, 464 U.S. 501, 505-10 (1984) ("*Press-Enterprise I*"); and preliminary hearings, *Press-Enterprise II*, 478 U.S. at 13-15.

Our circuit has further held that the presumption of access applies to other aspects of criminal trials as well, including judicial records such as videotapes of defendants, *In re Application of Nat'l Broad. Co.* (*United States v. Myers*), 635 F.2d 945, 952 (2d Cir. 1980); pretrial suppression hearings, *In re Application of the Herald Co. (United States v. Klepfer)*, 734 F.2d 93, 99 (2d Cir. 1984); plea agreements and plea hearings, *United States v. Haller*, 837 F.2d 84, 86-87 (2d Cir. 1988); information on the payment of court-appointed counsel, *United States v. Suarez*, 880 F.2d 626, 630-31 (2d Cir. 1989); bail hearings, *United States v. Abuhamra*, 389 F.3d 309, 323-24 (2d Cir. 2004); live *voir dire* proceedings, *ABC, Inc. v. Stewart*, 360 F.3d 90, 100 (2d Cir. 2004); and sentencing hearings, *United States v. Alcantara*, 396 F.3d 189, 191-92 (2d Cir. 2005). We have also held that the public's right implies that particular individuals may not be summarily excluded from court. *Huminski v. Corsones*, 396 F.3d 53, 83-84 (2d Cir. 2005).[8]

Most relevant for the present case, we have concluded that the First Amendment guarantees a qualified right of access not only to criminal but also to civil trials and to their related proceedings and records. *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 22 (2d Cir. 1984); *see also Hartford Courant*, 380 F.3d at 93 (civil and criminal docket sheets). Significantly, all the other circuits that have considered the issue have

---

[8] There is nothing to the contrary in the brief mention of this issue in *Posr v. Court Officer Shield #207*, 180 F.3d 409, 414 (2d Cir. 1999), where the complainant sought to assert the right to bring into the courtroom a bicycle pump, which was reasonably prohibited with the kind of time, place, and manner restrictions explicitly allowed in *Richmond Newspapers* and its progeny. *Richmond Newspapers*, 448 U.S. at 578.

come to the same conclusion. *See, e.g.*, *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253-54 (4th Cir. 1988); *In re Continental Ill. Secs. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984); *In re Iowa Freedom of Info. Council*, 724 F.2d 658, 661 (8th Cir. 1983); *Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983).[9]

This recognition of the right to attend civil trials derives from the fact that the First Amendment, unlike the Sixth, does not distinguish between criminal and civil proceedings; nor does it distinguish among branches of government. Rather, it protects the public against the government's "arbitrary interference with access to important information." *Richmond Newspapers*, 448 U.S. at 583 (Stevens, *J.*, concurring). As the district court below aptly noted, "[o]nce unmoored from the Sixth Amendment, there is no principle that limits the First Amendment right of access to any one particular type of government process." *NYCLU*, 675 F. Supp. 2d at 431 (internal quotation marks omitted).

However, neither our Court nor the Supreme Court has had occasion to consider under what conditions, if at all, a qualified right of access attaches to non-trial civil proceedings like the administrative adjudication at issue here. It is to that question that we now turn.

*A.      Applicability of the Experience and Logic Test*

The NYCTA would have us forgo the *Richmond Newspapers* test: it argues that administrative proceedings are *never* subject to a presumption of public access and that *Richmond Newspapers* and its progeny apply only to courts. The NYCTA argues that,

---

[9] The Supreme Court has not yet considered whether the public right of access applies to civil trials, but "six of the eight sitting Justices" in *Richmond Newspapers* "clearly implied that the right applies to civil cases as well as criminal ones." *Huminski*, 396 F.3d at 82 n.30.

since administrative proceedings were rare, if not nonexistent, in the early Republic, they are totally different from either criminal or civil trials, which enjoyed centuries of open access, dating back before the Founding. The First Amendment, the NYCTA claims, could not possibly guarantee a right to access something that barely existed at the time of the Founding. Instead, the NYCTA suggests, the issue of public access to administrative proceedings is one for the legislature or the administrative agency itself to decide, free from judicial supervision. This argument fails for several reasons.

The Supreme Court has not specified how courts should determine whether the experience and logic test applies to administrative proceedings. But we have good reason to think that this determination does not involve asking whether the proceedings in question have a history of openness dating back to the Founding. As the Sixth Circuit has stated, the "Supreme Court effectively silenced this argument in *Press-Enterprise II*, where the Court relied on exclusively post-Bill of Rights history in determining that preliminary hearings in criminal cases were historically open." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 700 (6th Cir. 2002) (citing *Press-Enterprise II*, 478 U.S. at 10-12).

More importantly, the NYCTA's claim is refuted by the reasoning of the public access cases themselves. These focus not on formalistic descriptions of the government proceeding but on the kind of work the proceeding actually does and on the First Amendment principles at stake. "[T]he First Amendment question cannot be resolved solely on the label we give the event, *i.e.*, 'trial' or otherwise, particularly where the [proceeding] functions much like a full-scale trial." *Press-Enterprise II*, 478 U.S. at 7. In extending the right of public access from the criminal trial to its components and on to

civil trials, the Supreme Court and the circuits have emphasized the importance of access to public participation and to government accountability—values, the courts have emphasized, that are central to democracy. "[T]he First Amendment . . . has a *structural* role to play in securing and fostering our republican system of self-government," *Richmond Newspapers*, 448 U.S. at 587 (Brennan, *J.*, concurring). And public access "serves to ensure that the individual citizen can effectively participate in and contribute to" self-government. *Globe Newspaper*, 457 U.S. at 604. There is little cause to think that this reasoning has significantly less force in the administrative context. And this is especially so when the administrative process at issue so closely resembles that of the courts. *See Detroit Free Press*, 303 F.3d at 710 ("A government operating in the shadow of secrecy stands in complete opposition to the society envisioned by the Framers of our Constitution.").

Of course, widespread administrative adjudication is a relatively new phenomenon. *Fed. Mar. Comm'n v. S. C. State Ports Auth.*, 535 U.S. 743, 755 (2002) (noting that "formalized administrative adjudications were all but unheard of in the late 18th century and early 19th century"). But changes in the organization of government do not exempt new institutions from the purview of old rules. Rather, they lead us to ask how the new institutions fit into existing legal structures. If, as the NYCTA suggests, government institutions that did not exist at the time of the Framers were insulated from the principles of accountability and public participation that the Framers inscribed in the First Amendment, legislatures could easily avoid constitutional strictures by moving an old governmental function to a new institutional location. Immunizing government proceedings from public scrutiny by placing them in institutions the Framers could not

have imagined, as the NYCTA urges, would make avoidance of constitutional protections all too easy.

Two other circuits have considered a similar question, and they have likewise concluded that "*Richmond Newspapers* is a test broadly applicable to issues of access to government proceedings," *North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198, 208-09 (3d Cir. 2002), and especially to "quasi-judicial" administrative proceedings, because "there is a limited First Amendment right of access to certain aspects of the executive and legislative branches," *Detroit Free Press*, 303 F.3d at 695. As a result, these circuits have each applied the experience and logic test in the administrative context. *See id.* at 705 (holding that the experience and logic test applies to removal proceedings and that the public has a qualified right of access to those proceedings); *North Jersey Media Group*, 308 F.3d 198 (holding that the experience and logic test applies to removal proceedings and that the public lacks a qualified right of access to those proceedings). The fact that, in applying this test, the circuits differed on how the test played out in no way counters their holdings, with which we agree, that the test applies to administrative trials.

Similarly, albeit in a different line of cases, the Supreme Court has recognized that the adjudicatory work of administrative agencies can be sufficiently like that of the courts to warrant requiring the agencies to follow principles that apply to courts. For instance, *Butz v. Economou*, 438 U.S. 478 (1978), which extended the absolute immunity enjoyed by Article III judges to administrative law judges, noted that judicial immunity "stems from the characteristics of the judicial process rather than its location" within one or another branch of government. *Id.* at 512. And, the Court determined, "adjudication

22

within a federal administrative agency shares enough of the characteristics of the judicial process" to render the work of "the modern federal hearing examiner or administrative law judge within this framework . . . functionally comparable to that of a judge." *Id.* at 512-13 (internal quotation marks omitted). More recently, *Federal Maritime Commission v. South Carolina State Ports Authority* concluded that states retained the sovereign immunity they enjoyed in court when they were subject to an administrative adjudicatory proceeding that "'walks, talks, and squawks very much like a lawsuit.'" *Fed. Mar. Comm'n*, 535 U.S. at 757 (quoting *South Carolina State Ports Authority v. Fed. Mar. Comm'n*, 243 F.3d 165, 174 (4th Cir. 2001)).

Such cases recognize that the principles governing adjudication do not lose validity when the adjudication moves to another branch of government. Indeed, as the Supreme Court has stated, "when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process." *Hannah v. Larche*, 363 U.S. 420, 442 (1960).

In the present case, the TAB acts as an adjudicatory body, operates under procedures modeled on those of the courts, and "impose[s] official and practical consequences upon members of society." *Richmond Newspapers*, 448 U.S. at 595 (Brennan, *J.*, concurring). When a neutral adjudicator determines whether public transit users have violated a Rule, that determination has the force of law and, like the criminal trial for which it substitutes, it is "a genuine governmental proceeding." *Id.* at 506. The TAB and the court serve similar functions, in similar ways, and have a similar effect on the parties before them.

In so holding, we need not, and should not, make any broad pronouncement about the right of access to administrative processes generally. Given the wide variety of proceedings that characterize the administrative state, that would be as foolhardy as it is unnecessary. But we have no trouble concluding that the First Amendment guarantees a presumptive right of access at least to this administrative forum. We therefore proceed to examine the experience and logic of open access to the TAB's proceedings.[10]

*B.*     *The Experience of Public Access to TAB Hearings*

Our inquiry is considerably simplified by the jurisdiction the TAB shares with the Criminal Court. The fact that an alleged violator may be subject either to a court or to a TAB proceeding at the total discretion of the police officer, rather than by reference to any alleged conduct, suggests that the two forums are "functionally comparable." *Butz*, 438 U.S. at 513 (internal quotation marks omitted). The *Richmond Newspapers* test looks not to the formal description of the forum but to the historical "experience in that *type* or *kind* of hearing throughout the United States." *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993) (internal quotation marks omitted) (emphasis in the original).

While the TAB's relaxed procedures and administrative placement differentiate it somewhat from the Criminal Court, the jurisdictional overlap and shared function of the two forums render them in important ways the same "*type* or *kind* of hearing." *Id.* Because of this, how the experience and logic inquiry comes out with respect to the Criminal Court largely determines how it comes out for the TAB as well. And, since access to criminal court hearings is the core of the entire *Richmond Newspaper* line of

---

[10] The Supreme Court has called the experience and logic prongs of the *Richmond Newspapers* test "complementary," *Press-Enterprise II*, 478 U.S. at 8, but it has not specified how much weight courts should give each prong. We need not determine the issue in this case, because both experience and logic lead clearly to the conclusion that the TAB is subject to a First Amendment right of access.

24

cases, a similar result for the TAB seems almost foreordained. The government cannot simply dress up a criminal trial in the guise of an administrative hearing and thereby evade the well-established requirement that criminal proceedings be open to the public.

Even without the functionally equivalent Criminal Court as a guide, however, we would come to the same conclusion. The NYCTA argues that because there is no history of open access to the TAB dating back to the First Amendment, TAB proceedings cannot be presumptively open under that amendment. But the Supreme Court has instructed us to ask not whether the First Amendment was formulated with some particular forum in mind, but whether "the place and process have historically been open." *Press-Enterprise II*, 478 U.S. at 8. If we understood this instruction to require us to look to the physical location and institutional proceeding at issue, we might conclude, as the NYCTA urges, that the offices of the TAB and its hearings have been subject to the current access policy for the TAB's entire brief history. To take this view, however, would be to rely on precisely the kind of formalism that the *Richmond Newspapers* line of cases eschews.[11] The *process* that goes on at TAB hearings is *a determination of whether a respondent has violated a Transit Authority Rule*. And *that* process was presumptively open from the

---

[11] The Supreme Court has not stated how long a history of openness the experience prong of the *Richmond Newspapers* test requires, and we need not resolve this issue here. "[W]e are mindful that '[a] historical tradition of at least some duration is obviously necessary, . . . [or] nothing would separate the judicial task of constitutional interpretation from the political task of enacting laws currently deemed essential.'" *Detroit Free Press*, 303 F.3d at 701 (quoting *In re The Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1332 (D.C. Cir. 1985)) (alterations in original). At the same time, we note that it makes less sense to assume that First Amendment principles require centuries of openness for validation than to evaluate the length of a tradition by reference to the kind of institution and proceeding involved in the particular case. As a result, the fact that the Rules governing behavior on New York public transit are themselves less than half a century old is less relevant to our inquiry than that their violation was prosecuted exclusively in open court for the first two decades of their existence, and that it continues to be so prosecuted when the citing police officer, in his or her discretion, issues a summons to Criminal Court rather than a notice of violation returnable to the TAB. *Cf. Suarez*, 880 F.2d at 631 (holding Criminal Justice Act, 18 U.S.C. § 3006A, forms presumptively accessible even though the statute was enacted only in 1964).

inception of the Rules system in 1966, when such proceedings were heard only in open criminal courts.[12]

*C.       The Logic of Public Access to TAB Hearings*

Our answer to the logic part of the inquiry is, again, guided by the logic of access to the Criminal Court, which has been well established. As with the experience prong, however, looking just to the TAB itself yields the same result. The logic prong of the inquiry essentially asks whether openness enhances the ability of the government proceeding to work properly and to fulfill its function. *Press-Enterprise II*, 478 U.S. at 8. This inquiry requires an understanding of what the function of a particular process is and an evaluation of the role of openness in it.[13]

---

[12] We are inclined to think that treating TAB hearings not as substitutes for Criminal Court hearings but as administrative proceedings in their own right might well yield the same result. The tradition of openness in formal administrative adjudicatory proceedings generally has amply demonstrated the "favorable judgment of experience." *Richmond Newspapers*, 448 U.S. at 589 (Brennan, *J.*, concurring). As *amici* New York Times *et al.* point out, administrative hearings at which individual rights are adjudicated have traditionally been open. Already in 1933, the District of Columbia Circuit noted that a "number of . . . acts of Congress creating [administrative] bodies . . . provi[de] . . . that all proceedings *shall* be public." *Hughes, Inc. v. FTC*, 63 F.2d 362, 363 (D.C. Cir. 1933); *see id.* at 363-64 (finding that "public hearings" serve the same purposes "whether in courts or bureaus" and are "wholly consonant with the modern view of functions of government").

The Supreme Court sounded a similar note when it required a few years later "that the inexorable safeguard of a fair and open hearing be maintained" in administrative adjudication. *Ohio Bell Telephone Co. v. Public Utilities Comm'n*, 301 U.S. 292, 304 (1937) (internal quotation marks and citations omitted). Contemporaneously, the Court described "a fair and open hearing" as one of "the rudimentary requirements of fair play," and found it "essential alike to the legal validity of . . . administrative regulation and to the maintenance of public confidence." *Morgan v. United States*, 304 U.S. 1, 15 (1938). That these values are essentially the same as those *Richmond Newspapers* ascribed to open *court* proceedings suggests that the history of quasi-judicial administrative proceedings includes an analogously strong tradition of public access. Mindful of the Supreme Court's injunction not to make unnecessary constitutional adjudications, *see Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, *J.*, concurring), we make clear that the discussion in this footnote is not an alternative holding.

[13] The Third Circuit has posited that this inquiry "perforce must take account of the flip side—the extent to which openness impairs the public good," because, "were the logic prong only to determine whether openness serves some good, it is difficult to conceive of a government proceeding to which the public would not have a . . . right of access." *North Jersey Media*, 308 F.3d at 217. Of course, the test has never been "whether openness serves some good," *id.*, but "whether [it] plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8. We think this phrasing already encompasses "the flip side." *North Jersey Media*, 308 F.3d at 217.

Court trials, which serve both as a "mechanism for judicial factfinding, [and] as the initial forum for legal decision making," *Richmond Newspapers*, 448 U.S. at 596 (Brennan, *J.*, concurring), have been held to depend on publicity as a check that "enhance[s] the fairness of the trial itself," *United States v. Doe*, 63 F.3d 121, 126 (2d Cir. 1995). TAB proceedings similarly serve an adjudicatory function that determines respondents' rights. As a proceeding that, like a trial, involves both factfinding and legal decision making, the TAB hearing is subject to the same dangers—whether willful or accidental—as a trial, dangers that can be reduced significantly by the kind of "[p]ublic scrutiny . . . [that] enhances the quality and safeguards the integrity of the factfinding process." *Globe Newspaper*, 457 U.S. at 606.

Furthermore, in a TAB proceeding, individuals confront the power of their government to judge and penalize their actions; like a trial, it is a part of the "general administration of justice" that is central to government authority. *Doe*, 63 F.3d at 126. In this sense, like a trial, one of the TAB's functions is to maintain the public perception of government as a legitimate authority that satisfies "the appearance of fairness so essential to public confidence in the system." *Press-Enterprise I*, 464 U.S. at 508. And it is this "appearance of fairness" that has been held to be "enhance[d]" by open access. *Id.* at 508, 509.

Finally, because the TAB, like other administrative agencies, forms a part, albeit small, of a larger web of government authority, "[f]ree access [to it] . . . informs the populace of the workings of government and fosters more robust democratic debate," *Doe*, 63 F.3d at 126, thereby "serv[ing] to insure that the individual citizen can

effectively participate in and contribute to our republican system of self-government," *Globe Newspaper*, 457 U.S. at 604.

The NYCTA has not argued that public access would not enhance the TAB's functioning in these ways. Rather, it suggests that the possibility that some respondents would be dissuaded from contesting their notices of violation in person suffices to outweigh any potential benefits of publicity. But far from showing that this danger is real, the NYCTA has "offered no empirical support for th[is] claim." *Id.* at 609. Like the Sixth Circuit, "we do not believe speculation should form the basis for . . . a . . . restriction of the public's First Amendment rights." *Detroit Free Press*, 303 F.3d at 709. To the extent that a particular defendant or witness has a legitimate interest in excluding the public from a specific proceeding before the TAB, the NYCTA retains the authority to close the hearing room on an *ad hoc* basis, provided that its decision complies with the requirements set out in *Williams v. Artuz*, 237 F.3d 147 (2d Cir. 2001), and delineated below. Accordingly, because public access "plays a significant positive role in the functioning of the [TAB] process," *Press-Enterprise II*, 478 U.S. at 8, we hold that TAB proceedings are subject to a public right of access under the First Amendment.

*D.      Requirements for Closing Hearings and the TAB Policy*

The First Amendment right of access is always qualified. "Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial." *Richmond Newspapers*, 448 U.S. at 581 n.18 (plurality opinion) (internal citation omitted). The same, of course, applies as to other government proceedings subject to the

28

right of access. The Supreme Court has stated, however, that "the State's justification in denying access must be a weighty one," *Globe Newspaper*, 457 U.S. at 606, and that "[c]losed proceedings, although not absolutely precluded, must be rare and only for cause shown," *Press-Enterprise I*, 464 U.S. at 509. The *Globe Newspaper* Court, for instance, held that even the State's interest in shielding minor victims of alleged sex crimes "from further trauma and embarrassment" and "encourag[ing] . . . such victims to come forward and testify," 457 U.S. at 607, was insufficient to justify a statute requiring an across-the-board, mandatory closure of a court whenever such minors testified. Rather, *Globe Newspaper* made the trial court determine the necessity and propriety of closure on a "case-by-case basis." *Id*. at 608.

The standard for exclusion, as stated by the High Court, is that there be "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enterprise I*, 464 U.S. at 510; *see also Globe Newspaper*, 457 U.S. at 606-07 ("Where, as in the present case, the [government] attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest."). The "same standard applies whether the defendant is seeking or objecting to closure," and whether the motion is made under the Sixth Amendment or the First. *Doe*, 63 F.3d at 128.

In our circuit, a government proceeding subject to a qualified First Amendment right of access may be closed if four factors are satisfied: "'[1] the party seeking to close

the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.'" *Williams*, 237 F.3d at 152 (quoting *Waller v. Georgia*, 467 U.S. 39, 48 (1984));[14] *see also Doe*, 63 F.3d at 127 ("Given the presumption of openness, 'proceedings cannot be closed unless specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'") (quoting *Press-Enterprise II,* 478 U.S. at 13-14) (internal quotation marks and citation omitted).

Accordingly, we have recognized that "a person's physical safety" as well as "the privacy interests of individuals" such as witnesses, third parties, and those investigated in connection with a legal violation, may "warrant closure." *Doe*, 63 F.3d at 127. Thus, we have allowed a court to exclude the public from proceedings during the testimony of police officers whose undercover work was ongoing, *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997) (en banc); to exclude the public from part of *voir dire*, where the trial judge had made on-the-record findings that  the risk of juror dishonesty about racial bias in a highly publicized case sufficed to warrant keeping *in camera voir dire* transcripts sealed until after a jury had been impaneled, *United States v. King*, 140 F.3d 76 (2d Cir. 1998); and to limit the entrance of new observers to a trial during the testimony of a key witness in order not to distract the jury, *Williams*, 237 F.3d at 152.

---

[14] *Waller* dealt the closure of a criminal suppression hearing under the Sixth Amendment, but, as previously noted, although the interests at stake in Sixth Amendment and First Amendment publicity of government proceedings differ, the standards for closure are the same. *Doe*, 63 F.3d at 128. Indeed, *Waller* cites *Press-Enterprise I* on this point. *Waller*, 467 U.S. at 48.

The TAB's access policy, however, does not come close to meeting our standard for justifying closure. A respondent need not articulate any interest prejudiced by public access; the closure is total for that respondent's hearing; and the hearing officer neither considers alternatives nor makes any findings regarding the relative weight of the interests at stake. *See Williams*, 237 F.3d at 152. Indeed, the TAB's policy resembles one explicitly addressed by the Supreme Court in a case that struck down a local court rule "allowing [preliminary criminal] hearings to be closed upon the request of the defendant, without more." *El Vocero de Puerto Rico*, 508 U.S. at 150. That case and others have made clear that the government may not arbitrarily close its proceedings to the public when, as in the case before us, it does so by allowing private parties to wield the arbitrary power.

## CONCLUSION

We conclude that the TAB's current access policy violates the public's First Amendment right of access to government proceedings. We further conclude that the NYCLU's ability to carry out its mission would be irreparably harmed through the continued violation of this right.

We have considered all of the NYCTA's arguments and find them to be without merit. We therefore AFFIRM the district court's order permanently enjoining the NYCTA from enforcing the TAB's current access policy and requiring any future closure of TAB hearings to the public to comport with the narrow tailoring and on-the-record factfinding required by the First Amendment.

31