In re the IOWA FREEDOM OF INFOR-
MATION COUNCIL and Des Moines
Register and Tribune Company, Peti-
tioners.

No. 83–1573.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 11, 1983.

Decided Dec. 30, 1983.

As Amended Jan. 27, 1984.

Lawrence R. Elleman, Cincinnati, Ohio, for respondents The Honorable Edward J. McManus, and The Procter & Gamble Co.; Timothy White, Cedar Rapids, Iowa, Dinsmore & Shohl, Cynthia Nitz Ris, Mark C. Bissinger, Cincinnati, Ohio, of counsel.

Michael A. Giudicessi, Associate Gen. Counsel and Asst. Secretary, Des Moines Register and Tribune Co., Des Moines, Iowa, for petitioners.

Before ROSS, ARNOLD and JOHN R. GIBSON, Circuit Judges.

ARNOLD, Circuit Judge.

Petitioners, representatives of the press in Iowa, ask this Court to issue a writ of mandamus directing the District Court[1] to release all portions of transcript under seal in a contempt hearing involving Tom Riley, a lawyer. The District Court closed part of the hearing to the press and public because testimony with respect to valuable trade secrets was to be given. It later opened all but a small portion of the transcript. We agree that the portion of the transcript still unrevealed contains trade secrets, and that it was necessary to deny release of this portion of the transcript in order to protect property rights in these secrets. We therefore deny the petition for mandamus. We also make certain observations about the procedure followed by the District Court in

1. The Hon. Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa.

this case, for the future guidance of the district courts in this Circuit.

## I.

The contempt hearing against Riley arose out of an action styled *Kehm v. Procter & Gamble Manufacturing Co.*,[2] in which Riley represented Michael Kehm in an action for wrongful death against Procter & Gamble (P & G). Kehm alleged that his wife died from toxic-shock syndrome caused by Rely tampons, a P & G product. During discovery, Riley signed a non-disclosure agreement promising to keep confidential certain information he had acquired about the P & G companies, part of which P & G claimed involved trade secrets. On August 12, 1981, the District Court entered a protective order based on this agreement.

After the trial in the wrongful-death case Riley sold certain documents to over 30 different attorneys involved in toxic-shock-syndrome litigation against P & G, including plaintiff's exhibits 22 and 27, the two documents that the District Court eventually found to contain trade secrets.[3] P & G then initiated a contempt proceeding against Riley, claiming violations of the protective order. On February 25, 1983, the District Court ordered Riley to show cause why he should not be held in contempt. The contempt proceeding began on April 7, 1983, and lasted for four days. On April 8, P & G requested that the courtroom be closed to the public and press because part of the testimony on that day would involve trade secrets. The Court then ordered that the session be closed and directed the marshal to exclude all non-parties. At this point, a reporter tried to object to the closure, but the Court refused to hear her objection. The April 8 session was then conducted *in camera,* after which the court remained in recess until April 14.

On the morning of April 14, petitioners filed a motion for the release of the April 8 transcript, which the Court took under advisement. During the April 14 proceedings, P & G renewed its motion for closure. An attorney present for the media objected and was allowed to argue his objections. He asked that an *in camera* hearing be held to determine whether the documents in question were trade secrets and that he be allowed to attend the hearing and to cross-examine P & G witnesses. The lawyer promised that he would not reveal to anyone what occurred at the *in camera* hearing, if the Court, at the conclusion of the hearing, decided that trade secrets were involved and that it was necessary to close the hearing to protect the secrets. The Court denied the request, stating that it had not yet decided whether trade secrets were involved but would release the transcript if it determined that they were not. Following further interchange, the media attorney asked the Court to articulate the reasons for closure, to which the Court replied that the testimony involved trade secrets. Shortly thereafter, the Court ordered the courtroom cleared of all non-parties.

On April 29, 1983, petitioners filed a petition for mandamus with this Court. We ordered that the petition be held in abeyance until the District Court ruled on the petitioner's motion to release the April 8 transcript. On June 28, 1983, the District Court released all exhibits from the protective order except exhibits 22 and 27 and all transcript testimony except that relating to exhibits 22 and 27, ruling that those two exhibits involved trade secrets. With the entry of this order, we are now in a position to rule on the petition for a writ of mandamus.

## II.

Petitioners argue that the District Court's procedure in closing the contempt hearing was deficient in several respects:

---

**2.** The District Court entered judgment against P & G, and we have now affirmed. *Kehm v. Procter & Gamble Mfg. Co.,* 724 F.2d 613 (8th Cir. 1983).

**3.** At the *Kehm* trial these exhibits were marked as plaintiff's exhibits 22 and 27 but were not introduced in evidence. The same two exhibits were marked as defendant's exhibits W and X at the show-cause hearing but were again not admitted into evidence.

most notably, because the Court failed to give the press adequate notice of and the opportunity to object to the motion for closure and failed to make adequate findings that trade secrets were involved before continuing with the main contempt hearing. We find some merit in these objections; however, because the contempt hearing has ended, there is no purpose in issuing a writ of mandamus instructing the Court in the procedures that should have been followed. Nonetheless, we believe it appropriate in light of the significant First Amendment interest in public access to trials to indicate what procedures a court should follow in ruling on a motion for closure, and in what respects the District Court here failed to follow such procedures.

In *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), and *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the Supreme Court recognized the. First Amendment right of the public to attend criminal trials. In neither case did the Court address the question whether the First Amendment also applies to contempt hearings, proceedings which are partly civil, partly criminal in nature, but the Court's reasoning for finding a First Amendment right of public access to criminal trials clearly supports such an application.

■ In *Globe Newspaper Co.* the Court stated that two features of criminal trials explain why a right to access should be afforded protection by the First Amendment. First, the criminal trial has historically been open to the public. 457 U.S. at 605, 102 S.Ct. at 2619. Second, such access can enhance the quality and safeguard the integrity of the fact-finding process and foster an appearance of fairness. *Id.* at 606, 102 S.Ct. at 2620. Without going into historical analysis, this Court notes, as was noted by a plurality opinion of Chief Justice Burger, that "historically both civil and criminal trials have been presumptively open." *Richmond Newspapers, Inc., supra,* 448 U.S. at 580 n. 17, 100 S.Ct. at 2829 n. 17. In addition, the presence of the public and

press at civil proceedings will enhance and safeguard the quality of the fact-finding process, just as it does at criminal trials. Arguably, the public interest in securing the integrity of the fact-finding process is greater in the criminal context than the civil context, since the condemnation of the state is involved in the former but not the latter, but it is nonetheless true that the public has a great interest in the fairness of civil proceedings. Hence, we conclude that the protection of the First Amendment extends to proceedings for contempt, a hybrid containing both civil and criminal characteristics.

■ We now consider what procedures the First Amendment requires a court to follow when a motion for closure of hearing is made. Here, the District Court declined to hear objections that a reporter wished to voice, informing her instead that the hearing would be closed and that it would consider her objections at some later time. We think this action was too precipitate. Whenever an objection to closure is made, the Court must allow the objecting parties a reasonable opportunity to state their objections. See *United States v. Brooklier,* 685 F.2d 1162, 1168 (9th Cir.1982). This opportunity need not take the form of an evidentiary hearing or encompass extended legal argument. See *Gannett Co. v. DePasquale,* 443 U.S. 368, 445–46, 99 S.Ct. 2898, 2939, 61 L.Ed.2d 608 (1979) (Blackmun, J., concurring in part and dissenting in part, joined by three other Justices). But where a member of the media or the public objects to a request by a party that a hearing be closed, or to a proposal by the court on its own motion that a hearing be closed, the court must give him or her a reasonable opportunity to state the objection. In the present case, however, this error was harmless. We hold in Part III of this opinion that trade secrets were in fact involved, and that substantial damage to P & G's property rights in these secrets would have occurred had the hearing not been closed. We also hold that no reasonable alternative existed to closure, sufficient to protect these property rights. In other

words, even if the District Court had heard the reporter out, as we believe it should have, it would still have been within its rights in deciding to close the hearing, at least in part, so the failure to give more extended consideration to the reporter's attempt to object does not entitle petitioners to any relief in the present procedural context.

Petitioners also argue that it was error to close the hearing without first making a determination that trade secrets were involved, and that P & G would be irreparably damaged if the hearing were not closed. We held in *In re United States ex rel. Pulitzer Publishing Co.*, 635 F.2d 676 (8th Cir.1980), that findings justifying closure must be made before closure takes place. There, we granted a writ of mandamus because the District Court failed to state its reasons and weigh alternatives before closing voir dire of a jury to the public and the press. *Id.* at 678–79. However, in the trade-secrets context, the requirement of prior findings justifying closure cannot be liberally applied without some modification. Trade secrets are a peculiar kind of property. Their only value consists in their being kept private. If they are disclosed or revealed, they are destroyed. Therefore, it makes no sense to say that a determination whether trade secrets are involved should be made in open court, with the hearing to be later closed only if the determination is that they are involved. For in order to make this very determination, the Court must consider the information that one of the parties claims constitutes a trade secret, and the damage to that party that may occur if the claimed secrets are revealed. We do not see, as a practical matter, how this kind of decision can be made without at least some limited initial *in camera* consid-

eration.[4] We will insist, in future cases, that the *in camera* consideration be as strictly limited as possible. After initially hearing the objections to closure, the district court, if it considers the objections not well taken,[5] should go into *in camera* session, and take testimony limited strictly to the issue of the existence of trade secrets and the damage that disclosure of those secrets might cause. If it determines that secrets are involved, it should then return to the courtroom, announce this determination, and state that the remainder of the proceeding will be conducted *in camera.* If it determines that secrets are not involved, it should of course return to the courtroom and conclude the case in open court.

This is close to what occurred in the District Court in the case before us. The very question in the contempt proceeding was whether trade secrets had been revealed in violation of a court order and, if so, whether P & G had been damaged by these revelations, so as to make appropriate the imposition of some sanction on the allegedly offending attorney. Petitioners have made no practical suggestion to us, either in their briefs or at the oral argument, as to how the trade secrets could have been protected in some other way. The suggestion made by counsel in the court below, that he be allowed to participate in the *in camera* proceedings under some kind of pledge of secrecy, has not been renewed. In fact, at the oral argument counsel informed us that his client had directed him to withdraw this suggestion.

We note that the Court has now released to the parties most of the transcript, but we are not holding that release of the transcript is an adequate substitute for the presence of reporters and the public at the

4. Counsel for petitioners, even while stating his objections to the District Court, seemed to admit as much: "Your Honor, it does put the Court in a precarious position of having to decide an issue in open Court and therefore while I might find it objectionable in principle I think from a pragmatic matter this Court could hold a hearing in camera to discuss whether or not Procter and Gamble can meet its burden of proof." Tr. 448.

5. There may be objections whose nature is such that they *can* be considered in open court. If, for example, exhibits claimed to contain trade secrets have already been introduced in evidence in a public proceeding, the court could so find without closing the hearing. Such a finding might require that the motion for closure be denied.

hearing. Such a holding would be inconsistent with *Pulitzer,* and would also fail to give proper weight to the high value placed on the right of public access to the courts for which the public pays. "[T]he availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom." *Richmond Newspapers, Inc., supra,* 448 U.S. at 597 n. 22, 100 S.Ct. at 2838 n. 22 (Brennan, J., concurring in the judgment).

■ Petitioners also complain that the District Court erred in simply accepting the representation of counsel for P & G that trade secrets were involved. Ordinarily such a representation should not be accepted without question. The representation of counsel, either orally or in pleadings or a brief, is most likely the way that the question of the existence of the trade secret will be raised. When such representation is made, an issue is presented that must be determined by the district court. Whether trade secrets are involved or not, and whether their revelation will cause damage to someone, are questions of fact, to be decided after receiving evidence. In such an important matter, courts should not simply take representations of interested counsel on faith. In the present case, though, we are mindful that the District Court, having tried the *Kehm* case and being familiar with the discovery proceedings, including the protective order, which preceded that trial, was already intimately familiar with the trade-secrets issue and its implications. In this special situation, we are not persuaded that it was error for the District Court to accept, at least provisionally, the representation of counsel for P & G that trade secrets were involved. This representation was sufficient to justify closing the hearing, for the limited purpose of determining the existence of trade secrets, and subject always to the duty of the court to reopen the hearing if it should become convinced either that no trade secrets were present or that they could somehow be protected without conducting the entire contempt proceeding in private.

Petitioners also suggest that we use this case as a vehicle for announcing standards with respect to the giving of notice of motions for closure to the press and the public. This issue was explicitly addressed in *United States v. Criden,* 675 F.2d 550 (3d Cir. 1982). There, the Court determined that the public interest in access required that notice be given prior to the closure of a pretrial criminal proceeding, so that objections to closure could be made. *Id.* at 559. The Court required trial courts in the Third Circuit to docket motions for closure of such proceedings sufficiently in advance of a hearing on or disposition of such motions to afford interested parties an opportunity to intervene and assert their views. In laying down this procedure, the Court stated also that a more streamlined notification process might be permitted in special situations, where, for example, a suppression motion must be heard during trial and closure is requested. *Id.* at 560 & n. 8. The Court also stressed that it was not dealing with a motion for closure made in open court during a trial. *Ibid.*

■ The context of the case before us does not require that we address the question of prior notification to the same extent as the *Criden* Court did, and we decline to do so in the abstract. Here, a contempt trial had begun in open court. A representative of the media was present. When one of the parties moved that the hearing be closed, there was sufficient notice to enable the media to object, and in fact their representative did attempt to object. We believe that under the circumstances sufficient notice and opportunity to object were given, or rather would have been given if the District Court had heard the objections out on the spot.

For the foregoing reasons, we do not believe that any procedural default on the part of the District Court would justify us in issuing the extraordinary writ of mandamus. The possibility remains that the District Court's determination not to release all of the transcript may have been substantively mistaken. We therefore now turn to

the question whether the portions of the transcript that the District Court finally decided not to reveal, those portions relating to exhibits 22 and 27, were in fact so related to trade secrets of P & G that their disclosure was properly withheld.

### III.

█ We have carefully examined the two exhibits in question, as well as the 62 pages of the 649-page transcript that petitioners have not yet been permitted to see.[6] As the District Court's order of June 28 states, the material at issue relates to distribution schedules for two types of tampons known as Rely K and Rely J. As petitioners point out, these products were never actually placed on the market, and at the time of the hearing P & G was not producing or selling any tampons.

We nevertheless believe that the District Court properly concluded that the portions of the transcript in question should be kept under seal. The pages in question explain how information contained in exhibits 22 and 27 would be of substantial benefit to a competitor of P & G. We know little or nothing about the business involved in this case, and, had we been sitting as triers of fact, we might have reached a conclusion different from the District Court. But there was clear and convincing testimony that the marketing and distribution plans contained in exhibits 22 and 27 could be of substantial use to competitors anxious to learn what P & G's plans might be as to other, similar products now being marketed. It was for the District Court to accept or reject this testimony. We see no error of law that was committed, nor has any clearly erroneous finding of fact been made on this issue. We therefore affirm the District Court's determination that the pages in question did contain trade secrets, the revelation of which to competitors would do

considerable damage to P & G's business and property.

█ Petitioners suggest that even if we decide that trade secrets are involved, they might still be entitled to a writ of mandamus. The argument is that First Amendment rights can be overridden only by a compelling governmental interest, and that we should weigh the First Amendment rights at stake against the property rights at stake. We questioned counsel closely at the oral argument as to what standards might be used in any such weighing, and no satisfactory criteria were suggested. We stress that this case involves private commercial conduct. If the material still under seal had some substantial relation to an important governmental or political question, an entirely different question would be presented, and we might be required to embark on the weighing process urged on us by petitioners. In the present case, though, there seems to be no such necessity. As we have previously explained, trade secrets partake of the nature of property, the value of which is completely destroyed by disclosure. Where only private commercial interests or damage are involved, we think the law justifies the steps taken by the District Court to avoid the destruction of these property rights.

We do not wish to be understood as announcing a rule that the presence of trade secrets will in every case and at all events justify the closure of a hearing. Where interests of the magnitude involved here are present, the courts must proceed cautiously and with due regard to the uniqueness of the particular facts before them. Here, although we have disagreed in part with the procedures followed by the District Court, we believe that in the main that Court proceeded properly and within the limits of its discretion.

Petition denied.

---

6. Petitioners' reply brief, p. 7, lists the following pages of transcript as not yet having been revealed: 209, 211, 213, 254–61, 288–97, 309–24, 506–17. Pages 209, 211, and 213 do not relate to the two exhibits in question, and P & G concedes that they are not subject to the District Court's order of confidentiality. Accordingly, the Clerk of this Court is directed to release copies of these pages to counsel for petitioners simultaneously with the filing of this opinion.