Newsday v. County of Nassau

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: March 6, 2013     Decided: September 23, 2013)

Docket Nos. 12-2728-cv,* 12-2731-cv

NEWSDAY LLC, NEWS 12 NETWORKS LLC,

*Intervenors-Appellants*,

SHARON DORSETT, individually and as the Administratrix of the Estate of
JO'ANNA BIRD,

*Plaintiff*,

PETER SCHMITT,

*Non-Party Defendant*,

— v. —

COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, OFFICE OF THE
NASSAU COUNTY DISTRICT ATTORNEY, ROBERT ARIOLA, Detective, in his official
and individual capacities,

---

* The case with docket no. 12-2728-cv was withdrawn by an order filed on
August 8, 2012.

1

*Defendants-Cross-Claimants-*
*Appellees*,

JOHN AND JANE DOES 1-10, Police Officers and/or Detectives, JOHN AND JANE DOES 1-10, District Attorney,

*Defendants-Appellees*,

POLICE BENEVOLENT ASSOCIATION OF THE POLICE DEPARTMENT OF THE COUNTY OF NASSAU, INC.,

*Intervenor-Appellee*,

LEONARDO VALDEZ-CRUZ,

*Defendant*.[*]

————————————

B e f o r e:

LYNCH, LOHIER, and CARNEY, *Circuit Judges*.

————————————

Intervening in contempt proceedings arising out of a civil rights action below, Newsday LLC and News 12 Networks LLC appeal from orders of the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*) denying them access to court proceedings and a sealed internal police

————————————

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

document and continuing to redact parts of hearing transcripts. Intervenors argue that either the First Amendment or the common law right of access to courts entitles them to inspect both the transcripts and the sealed police report in full, or at least with only limited redaction. We conclude that the First Amendment's presumptive right of access applies in civil contempt proceedings, and that this right entitles intervenors to a copy of the full transcript of the contempt proceeding, but that the police report was not sufficiently central to the contempt proceedings to qualify as a "judicial document" and thus trigger the First Amendment's presumptive right of access. The case is remanded for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

Judge Lohier concurs in a separate opinion.

———————

DAVID A. SCHULZ (Jacob P. Goldstein, *on the brief*), Levine Sullivan Koch & Schulz, LLP, New York, New York, *for* Intervenors-Appellants.

DENNIS J. SAFFRAN, *for* John Ciampoli, County Attorney of Nassau County, Mineola, New York, *for* Defendants-Cross-Claimants-Appellees and Defendants-Appelles.

SETH H. GREENBERG, Greenberg Burzichelli Greenberg P.C., Lake Success, New York, *for* Intervenor-Appellee.

———————

3

GERARD E. LYNCH, *Circuit Judge*:

This appeal stems from ongoing attempts by various news organizations to gain access to sealed court proceedings, transcripts, and discovery documents. Their marked persistence in pursuing the matter is a result of the public interest in the underlying, and now-settled, civil suit that generated the civil contempt action that was the focus of the constitutional right-of-access claims that face us on appeal. Despite this complex posture, the questions this appeal presents are straightforward. First, does the First Amendment's presumptive right of access to court proceedings attach to civil contempt proceedings and related documents? Second, for each of the documents sought, does that presumptive right of access require disclosure in this particular case?

**BACKGROUND**

I.      The Underlying Lawsuit

On March 19, 2010, Sharon Dorsett filed a civil rights suit both on her own behalf and on behalf of the estate of Jo'Anna Bird, her daughter, alleging that various state actors affiliated with the Nassau County Police Department had negligently contributed to Bird's fatal stabbing by her ex-boyfriend and her

4

child's father, Leonardo Valdez-Cruz.[1]  Bird had obtained several orders of

protection against Valdez-Cruz on behalf of herself and her child, and those

orders were in effect during the weeks and days leading up to Bird's death.[2]  For

intermittent periods of time prior to Bird's death, moreover, Valdez-Cruz was in

police custody.  Nevertheless, the complaint alleged, despite the court orders and

the supposed police supervision, that Valdez-Cruz "tortured, stalked, menaced,

maimed, harassed, annoyed, injured, threatened, mutilated, kidnaped and

killed" Bird as a direct result of the County's and the Police Department's

negligence.  Compl. ¶ 8.  The complaint further alleged that this negligently lax

supervision resulted at least in part from Valdez-Cruz's status as a police

informant.  Id. ¶¶ 126, 296.

During the course of the litigation, Dorsett sought various documents from

defendants, including an internal police report detailing the results of an

---

[1] Valdez-Cruz was also a named defendant in the suit.  For purposes of this opinion, however, the term "defendants" refers to the police-related defendants and excludes Valdez-Cruz.

[2] In 2010 Valdez-Cruz was convicted of first-degree murder, second-degree burglary, aggravated criminal contempt, seven counts of first-degree criminal contempt, second-degree criminal contempt, fifth-degree criminal possession of stolen property, and fourth-degree criminal possession of a weapon. He was sentenced to life in prison.

investigation into the matter. This document, which is 712 pages long, is styled "Nassau County Police Department Internal Affairs Unit Investigation Report 14-2009" ("IAU Report" or "Report"). Defendants eventually produced a redacted copy of the Report to Dorsett and her counsel, and did not seek to place that copy under seal. Dorsett objected to the extent of redactions to the Report, and the magistrate judge (A. Kathleen Tomlinson, *Magistrate Judge*) ruled that some but not all of the redactions inappropriately concealed information that was relevant to Dorsett's claims and therefore discoverable by her.

II.     The Initial Protective Order

After receiving the redacted copy of the IAU Report, Dorsett's counsel issued a press release announcing a press conference. The purpose of the press conference, which was to be held on the morning of December 1, 2010, was to release the redacted Report to the general public. The day before the press conference, the defendants moved orally for an injunction or protective order prohibiting the release of the contents of the Report to the general public and requested an emergency hearing on the motion. The magistrate judge heard argument from both sides by conference call at 5:00 p.m. the evening before the announced press conference. At the conclusion of the hearing, the magistrate

6

judge granted defendants' motion and temporarily restrained and preliminarily enjoined Dorsett's counsel from releasing the contents of the Report. After that preliminary ruling, the parties submitted supplemental briefing on the appropriateness of an extension of the injunctive relief. Additionally, Newsday LLC and News 12 Networks LLC (collectively, the "intervenors" or "press intervenors") sought, and were granted, leave to intervene in the case for purposes of (a) opposing defendants' motion for an injunction or protective order and (b) moving to unseal any motion papers or transcripts related to the IAU Report.

On January 14, 2011, the magistrate judge considered the motions in full and concluded that defendants had met the threshold showing of "good cause" required by Federal Rule of Civil Procedure 26(c) for issuance of a protective order. In so finding, the magistrate judge rejected intervenors' argument that the Report was at that point a "judicial document" and therefore concluded that it did not trigger the common law presumption in favor of public access. Importantly, the magistrate judge noted that her determination that the IAU Report was not a judicial document was limited to the case's posture at the time, and that the course of discovery and motion practice might transform the Report

7

into a judicial document – and therefore create a presumption of public access – at a later date.[3]

Defendants in the underlying lawsuit ultimately reached a settlement with Dorsett, but the agreement was contingent upon approval by the Nassau County Legislature and the Nassau County Interim Finance Authority. Pursuant to this clause, defendants sought legislative approval for the $7.7 million payment that the settlement called for. Several members of the legislature, including the eventual contempt defendant Peter Schmitt, refused to approve such a large settlement without reviewing the evidence that justified it. Those legislators accordingly requested that the district court permit them to review the evidence in the case, including the IAU Report, which was still subject to the magistrate judge's protective order. On December 15, 2011, the district court (Arthur D. Spatt, *Judge*) provided Schmitt and the other legislators with the IAU Report subject to an additional confidentiality order prohibiting them from conveying to anyone else information learned exclusively from the Report and not

---

[3] Although the magistrate judge issued a protective order, she did not take the further step of granting an injunction, finding that the more stringent "irreparable harm" standard of Federal Rule of Civil Procedure 65 for such relief was not met. The magistrate judge also granted the intervenors' motion to unseal the motion papers regarding the injunction and protective order.

independently from another source.[4]

Despite the protective order, Schmitt made a statement during a televised editorial that appeared to reveal information contained in the Report. Specifically, Schmitt stated:

> There are 22 police officers in this county who were mentioned in that confidential Internal Affairs report who ought to be ashamed to look at themselves in the mirror every morning when they get up to shave, much less be wearing the badge. . . . Orders of protection were ignored . . . mandatory arrests were called for and not performed, giving a cell phone to the prisoner when he was behind bars and allowing him to call the victim 35 to 40 times, and on and on and on.

Upon learning of Schmitt's statements, the Police Benevolent Association of the Police Department of the County of Nassau, New York, Inc. ("PBA") sought to intervene in the then-settled civil case to enforce the district court's December 15, 2011 confidentiality order. The district court granted the motion to intervene and scheduled a hearing to consider whether Schmitt was in contempt of the confidentiality order. Those civil contempt proceedings began on May 31, 2012.

---

[4] The record does not disclose why the legislators obtained the IAU Report from the court as part of this litigation rather than from the County Attorney's office or the Police Department pursuant to the oversight powers of the County Legislature.

III.    The Contempt Hearing

The contempt hearing began in open court but was moved into Judge Spatt's chambers at the request of Schmitt's counsel. At the outset of the proceedings, Judge Spatt declined to review a copy of the Report to compare it against Schmitt's public statement, and instead requested that the PBA produce a witness to testify as to the contents of the Report. The PBA asked that the witness be given a copy of the Report "to refresh his recollection," and the district court recessed to allow the PBA to find a witness familiar with the contents of the Report. When the proceedings resumed, the district court asked, "Is there a request to seal the courtroom?" Both the County and the PBA said yes. Matthew Chayes, a reporter for Newsday who was present in the courtroom, requested time to contact the newspaper's counsel to object formally to the closing of the courtroom. Frank Eltman, a reporter from the Associated Press, joined in the application. The district court declined to allow such a recess, confirmed that Chayes was himself objecting to the closing of the courtroom, and overruled the objection.[5] Counsel for the press intervenors renewed their objections with the

_____

[5] In closing the courtroom, the district court also excluded reporters from News 12 and the Associated Press.

10

district court's staff by telephone during the sealed proceedings, but chambers staff declined to interrupt the sealed proceedings and directed the press intervenors to file their objections in writing.

The sealed proceedings continued with the testimony of Nassau County Police Department Assistant Chief Neil J. Delargy, who supervised the Internal Affairs Unit that had produced the Report. Delargy was allowed to review the Report during the course of his testimony, and on two occasions he relied on the text of the Report in answering questions. At the conclusion of his testimony, the district court granted the parties' request that Delargy be allowed to go through the entire Report to confirm the number of police officers mentioned in the Report. Then, at the close of the PBA's case, while the courtroom was still closed, the parties made arguments regarding the sufficiency of the evidence to prove civil contempt.

Next, and with the courtroom still closed, Schmitt took the stand to testify in his own defense. Schmitt's testimony tended to show that the information he revealed in the interview quoted in the television editorial had been otherwise publicly available. At the end of Schmitt's direct examination, the district court reopened the courtroom, having concluded that no testimony about the contents

11

of the Report would be elicited; the courtroom remained open for the remainder of Schmitt's testimony.

Finally, the district court once again sealed the courtroom as Delargy retook the stand after completing his review of the Report. Delargy testified that 104 members of the Nassau County Police Department were mentioned in the Report and supporting exhibits, and that either eighteen or twenty-three of those were mentioned in the body and summary of the Report.[6] At no point during Delargy's testimony were the names or ranks of the officers revealed, although he did reveal how many of the police officers mentioned were women. At the close of Delargy's testimony, the courtroom was reopened for closing arguments.

That evening, the press intervenors filed a letter brief formally objecting to the closing of the courtroom during the contempt hearing. They also sought release of a transcript of the hearing and all exhibits used during it. The district court held oral argument on the intervenors' requests and, on June 6, 2012, it

---

[6] On cross-examination, Delargy was questioned extensively about the exact number of police officers mentioned in the 139 pages of the Report that constitute its body and summary. He eventually testified that in one witness's statement, an additional five police officers were mentioned, and that witness's statement appeared in the body and summary of the Report, bringing the total number to twenty-three.

rejected them.  <u>Dorsett v. County of Nassau</u> ("<u>Dorsett IV</u>"), 866 F. Supp. 2d 187 (E.D.N.Y. 2012).  The district court concluded that the magistrate judge's original Rule 26 protective order, combined with the district court's subsequent confidentiality order, required that large portions of the contempt hearing transcript, as well as the IAU Report, remain under seal.  <u>Id</u>. at 194-96.  In deciding that the protective order required ongoing secrecy, the district court assumed without deciding that "the First Amendment and/or common law right of access attache[d] to the contempt proceedings at issue."  <u>Id</u>. at 193.  The district court explicitly relied on the magistrate judge's earlier finding of good cause in denying intervenors' application to unseal the IAU Report – notwithstanding the fact that its use at the civil contempt proceedings might have, as intervenors argued, transformed the Report into a judicial document.  However, after balancing the public's presumptive right of access afforded by the First Amendment and the common law against the interest of ongoing confidentiality, the district court concluded that significant portions of the hearing transcript should be unsealed.  <u>Id</u>. at 196.

The day after it rejected intervenors' requests, the district court held Schmitt in contempt and imposed a $2500 coercive sanction "in order to ensure

13

future compliance by Presiding Officer Schmitt and by other legislators that have viewed this Report." Dorsett v. County of Nassau ("Dorsett V"), No. CV 10-01258, 2012 WL 2076911, at *10 (E.D.N.Y. June 7, 2012). In so holding, the district court relied on its conclusion that Schmitt's comments were in fact based on his review of the Report. Id. at *3-6.[7]

The press intervenors timely appealed the district court's decision keeping the Report and transcripts under seal.

## DISCUSSION

I.   Standard of Review

We review a district court's decision to seal proceedings or place documents under seal for abuse of discretion. See United States. v. E. Air Lines, Inc., 923 F.2d 241, 245 (2d Cir. 1991). Additionally, the Supreme Court has noted that "[e]very court has supervisory power over its own records and files." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978). However, we have also held that the First Amendment concerns implicated by the sealing of proceedings or documents mandate close appellate scrutiny. In such cases, we have traditionally

---

[7] Schmitt filed a timely notice of appeal, but withdrew his appeal before filing a brief before this Court. Schmitt died on October 3, 2012.

undertaken an independent review of sealed documents, despite the fact that such a review may raise factual rather than legal issues. See, e.g., United States v. Aref, 533 F.3d 72, 82-83 (2d Cir. 2008). We therefore independently examine the Report and related transcripts with due consideration for the prerogative of the district court to administer the evidence before it.

II.     Legal Principles

Federal courts employ two related but distinct presumptions in favor of public access to court proceedings and records: a strong form rooted in the First Amendment and a slightly weaker form based in federal common law. We must determine whether either of those presumptions applies to the civil contempt hearing at issue in this case.[8]

---

[8] Although the issue of access to the physical courtroom as such is moot, the question is nevertheless squarely presented to us because intervenors seek release of the transcripts of those proceedings, and the question whether the First Amendment right applies to the transcripts is identical to whether the right applies to the physical proceedings.

We do note one difference, not in the applicable legal standards but in the practical considerations involved in applying them. A district judge considering whether to close a courtroom is necessarily engaged in an exercise of prediction regarding the *potential* for disclosure of material that may justifiably be protected even against the presumptive right of public access. That fact does not warrant indiscriminate courtroom closure because in many cases courts will be able to identify in advance those areas of testimony and portions of proceedings in which the risk of disclosure is greater or less. But the unpredictable vagaries of

The Supreme Court has held that the First Amendment presumptive right of access applies to all criminal trials. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 (1980). We have extended that principle and held that the First Amendment right applies "to civil trials and to their related proceedings and records." N.Y. Civil Liberties Union v. N.Y.C. Transit Auth. ("NYCTA"), 684 F.3d 286, 298 (2d Cir. 2012). In so holding, we have noted that the First Amendment "does not distinguish between criminal and civil proceedings," but rather "protects the public against the government's arbitrary interference with access to important information." Id. (internal quotation marks omitted). Based on this logic, we have held that the First Amendment right applies, among other things, to summary judgment motions and documents relied upon in adjudicating them, Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 124 (2d Cir. 2006), pretrial motions and written documents submitted in connection with

the courtroom do justify some caution. We therefore respect the discretionary decisions of district judges, who are more familiar with the issues, parties, and counsel before them, in managing proceedings before them. Judges (especially appellate judges) deciding whether transcripts can be released after the fact have the benefit of hindsight, and can determine more clearly whether the *actual* testimony in fact disclosed matters that are appropriately sealed. Thus, a finding ex post that a transcript is subject to public access in full does not entail the conclusion that the district court erred in excluding the public from the courtroom ex ante.

them, In re New York Times Co., 828 F.2d 110, 114 (2d Cir. 1987), and docket sheets, Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 93 (2d Cir. 2004).

We have applied two different approaches when deciding whether the First Amendment right applies to particular material. The "experience-and-logic" approach applies to both judicial proceedings *and* documents, and asks "both whether the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question." Lugosch, 435 F.3d at 120 (internal quotation marks omitted). The second approach – which we adopt only when analyzing judicial documents related to judicial proceedings covered by the First Amendment right – asks whether the documents at issue "are derived from or are a necessary corollary of the capacity to attend the relevant proceedings." Id. (internal quotation marks and alteration omitted).

Under the experience-and-logic approach, civil contempt proceedings, which carry the threat of coercive sanctions, implicate First Amendment values. As we have noted in the related context of the common law right of access, the need for public access to court proceedings is grounded in the "need for federal courts . . . to have a measure of accountability and for the public to have

17

confidence in the administration of justice." United States v. Amodeo ("Amodeo

II"), 71 F.3d 1044, 1048 (2d Cir. 1995). This observation applies with special force

in the context of contempt proceedings, which, although civil in nature, carry the

threat of coercive sanctions and seek to enforce the court's own orders. At least

one of our sister circuits has considered the issue and concluded that the

presumptive right applies to such proceedings. See In re Iowa Freedom of Info.

Council, 724 F.2d 658, 661 (8th Cir. 1983) ("[T]he protection of the First

Amendment extends to proceedings for contempt, a hybrid containing both civil

and criminal characteristics."). We therefore conclude that the First Amendment

right applies to civil contempt proceedings.[9]

However, to decide whether the First Amendment right applies to judicial

documents implicated in civil contempt proceedings – as opposed to the

proceedings themselves – courts must engage in a case-specific inquiry to

determine whether those documents are "derived from or [are] a necessary

corollary of the capacity to attend" the proceedings, Lugosch, 435 F.3d at 120

---

[9] Because in all cases where the First Amendment applies the common law right applies a fortiori, we need not address the common law right. In any event, the parties agree that the First Amendment right applies to the civil contempt proceedings at issue.

18

(alteration in original). Only those documents necessary to understand the merits of a civil contempt proceeding are covered by the First Amendment's presumptive right of access.

Even when it applies, moreover, the First Amendment right creates only a *presumptive* right of access. As we have noted, "[w]hat offends the First Amendment is the attempt to [exclude the public] without sufficient justification," NYCTA, 684 F.3d at 296, not the simple act of exclusion itself. Thus, the presumptive right of access prevails unless it is overcome by "specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." Lugosch, 435 F.3d at 124. Broad, general, and conclusory findings are insufficient to justify closure. In re New York Times Co., 828 F.2d at 116.

In contrast to the First Amendment right, the common law right attaches with different weight depending on two factors: (a) "the role of the material at issue in the exercise of Article III judicial power" and (b) "the resultant value of such information to those monitoring the federal courts." Amodeo II, 71 F.3d at 1049. In addition to the weight afforded to the presumptive right of access, the common law right is balanced against countervailing interests favoring secrecy.

Because of these differences between the common law right and the First

Amendment right, it is necessary to keep the two standards conceptually distinct

when analyzing a particular proceeding or document. Here, we apply only the

First Amendment standards, which apply to this proceeding and are more

favorable to the appellants.

II.    Application

        A.    Hearing Transcript

        The transcript of a proceeding is so closely related to the ability to attend

the proceeding itself that maintaining secrecy is appropriate only if closing the

courtroom was appropriate.[10] The district court's decision to keep parts of the

hearing transcript under seal was supported by the findings contained in its

order of June 6, 2012.[11] Dorsett IV, 866 F. Supp. 2d at 193-96. The district court

relied primarily on one broad category of countervailing factors: "whether public

---

[10] As noted above, however, even where prudence might have counseled closure ex ante, the inquiry concerning the release of the transcript proceeds with the benefit of hindsight, so that release of the transcript may be required even where closing the courtroom was justified given what might reasonably have been anticipated in advance.

[11] The district court made no on-the-record findings *before* sealing the courtroom. That was error, albeit error we need not address further because the issue is moot.

access to the materials at issue is likely to impair in a material way the performance of Article III functions." Dorsett IV, 866 F. Supp. 2d at 194, quoting Amodeo II, 71 F.3d at 1050. The district court concluded that because it had an interest in enforcing its own confidentiality order, and because opening contempt hearings to the public would put district courts in the absurd position of either maintaining the secrecy of the underlying materials or undermining their own protective orders, the First Amendment right was outweighed in this case. Nevertheless, the district court conducted a thorough review and reduced the extent of redaction from the transcript after determining that much of the testimony did not reveal any confidential information.

After conducting our own independent review of the hearing transcript, we conclude that the district court's concerns do not outweigh the public's First Amendment presumptive right of access to court proceedings. No portion of the hearing transcript reveals information that is sufficiently confidential that its disclosure would impair in any material way the performance of Article III functions. The portions of the transcript that remain redacted after Judge Spatt's order reveal only information about the date of the Report, the number of police officers mentioned in it, and how many of those officers were female. None of

these bits of information raises significant confidentiality concerns that would in themselves warrant sealing the courtroom or the transcript. We therefore conclude that the district court erred by concluding that the First Amendment right was defeated in this instance.

We note that we are not presented with the situation in which the hearing transcript did in fact contain significant confidential material. There may be circumstances in which a contempt proceeding will turn on specific confidential facts. We also note that there are several ways district courts may structure such proceedings to minimize the likelihood of disclosure. For example, it will often be possible in a case such as this one to enter a stipulation concerning the statements made and the contents of the confidential documents. Absent such an agreement, courts may limit questioning to address only whether the information stated publicly was in fact contained in the confidential materials.[12]

Because we conclude that nothing in the portions of the transcript that remain redacted presents confidentiality concerns that outweigh the public's First Amendment right of access to judicial proceedings, we direct the district court to

---

[12] We do not here decide whether specific, on-the-record findings about the difficulty of undertaking such minimization procedures could serve to defeat the First Amendment presumptive right of access.

release a full, unredacted copy of the hearing transcript.[13]

B.    IAU Report

In concluding that the IAU Report should remain sealed, the district court relied on the magistrate judge's prior finding of good cause in connection with defendants' motion for a Rule 26 protective order. However, the facts necessary to show good cause for a protective order applicable to discovery documents that are not yet implicated in judicial proceedings will not necessarily meet the higher threshold imposed by the First Amendment with respect to judicial documents. See In re Midland Nat'l Life Ins. Co., 686 F.3d 1115, 1120 (9th Cir. 2012); Union Oil Co. of Cal. v. Leavell, 220 F.3d 562, 568 (7th Cir. 2000); Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 252-53 (4th Cir. 1988) ("[D]iscovery [subject to a protective order] stands on a wholly different footing than does a motion filed by a party seeking action by the court."). The district court therefore erred by relying solely on the prior finding of good cause to determine that the First

---

[13] Intervenors also argue that the district court failed to docket various submissions made by the PBA or the defendants. To the extent the district court has failed to docket certain filings, we direct it to do so. Of course, the district court is free, after making the requisite findings, to place all or part of such filings under seal, if such sealing is justified under the standards set forth in this opinion.

23

Amendment right did not apply or was outweighed by countervailing factors. It does not follow, however, that the Report must be made public. We must conduct an independent review of the Report to determine (a) whether it is a judicial document to which the First Amendment right applies, and, if so, (b) whether the right of access is defeated in this case.

In independently reviewing the record, we determine the degree of judicial reliance on the document in question and the relevance of the document's specific contents to the nature of the proceeding. Here, of course, the entire contempt proceeding was, in some sense, about the Report. But this in itself is not sufficient to find the Report a judicial document. The mere fact that a dispute exists about whether a document should be sealed or disclosed, or that a party seeks to sanction another party for disclosing portions of a sealed document, cannot ipso facto create a presumption of access. As the district court recognized, such a rule would bootstrap materials that are not closely related to judicial proceedings into judicial documents.

We focus rather on the use that was made, and that the parties could reasonably have been expected to make, of the Report in connection with the contempt proceeding, in order to determine whether access to the Report would

24

materially assist the public in understanding the issues before the district court, and in evaluating the fairness and integrity of the court's proceedings. Our examination of the record leads inexorably to the conclusion that the substance of the full Report was not significantly relied upon or at issue in the contempt proceeding. Significantly, the Report did not need to be, and was not, entered into evidence, nor did the court rely on any portion of the Report that was not testified about in open court. Indeed, Judge Spatt declined the proposal that he read the full Report. Schmitt was charged with disclosing certain limited information contained in the Report, and the issue before the court was whether the information he disclosed was indeed derived from the Report. Thus, the only contents of the Report relevant to the contempt hearing were those that Schmitt revealed during the television interview. It would be absurd to conclude that in order to determine whether someone violated the court's order by disclosing one or two details from a lengthy, sensitive document, a court must place into the public record the entire document including other confidential material that had not been disclosed and that was not at issue in the contempt proceeding.[14]

_____

[14] In reaching this conclusion, we recognize that the key fact disclosed by Schmitt – that approximately twenty-two officers were mentioned and implicitly criticized in the Report – constituted a summary of a number of specific

25

The Report was utilized during the hearing only as a reference for Delargy to refresh his recollection during his testimony. That use, intervenors argue, raises it to the level of a judicial document. We disagree. As the police officer most directly responsible for its preparation, Delargy testified as a witness with personal knowledge of the Report. Only his testimony, and not the material used to refresh his recollection, could be relied on by the court in deciding the contempt application. Delargy's use of a copy of the Report during his testimony was therefore analogous to a police officer's review of his notes prior to testifying at a criminal trial. Such use does not make such notes evidence that is part of the trial record, nor does it render the Report a judicial document for First Amendment purposes.[15]

---

statements from the Report rather than a quotation of a discrete sentence within it, and that Delargy reviewed the entire Report in order to verify the number. The point remains that Schmitt's disclosure, and Delargy's corresponding testimony, disclosed only that general fact, and that additional details of the Report were not disclosed by Schmitt, testified to by Delargy, nor relevant to the contempt proceeding.

[15] We respectfully disagree with the approach to this issue taken in Judge Lohier's concurring opinion. Finding that a document is a "judicial document" triggers a presumption of public access, and requires a court to make specific, rigorous findings before sealing the document or otherwise denying public access. It is not, and should not be, an easy matter to deny the public access to documents that are utilized in judicial proceedings and form part of the basis of

We conclude that the Report, as it was used or as it could be expected to be used in the contempt hearing, is not the type of judicial document to which the

judicial decision-making, since the public is ordinarily entitled to review such material in order to understand and evaluate the actions of the courts. For that reason, the category of "judicial documents" should not be readily expanded. The fact that a document is relevant to the subject matter of a judicial proceeding, or that the proceeding was in some way stimulated by the document, does not make it public.

Unlike Judge Lohier, we conclude that the fact that the district court avoided "'relying' on the Report by not reading it" (Concurring opinion, post, at 2), where the Report was never put into evidence, underscores why the Report is *not* a judicial document. Parties are entitled to litigate issues that divide them, if they can fairly do so, without thereby exposing to public view confidential materials. A party may wish, for purposes of advancing its litigation position, to introduce a confidential document into evidence, attach it to a brief or other submission, or take a position that entitles its adversary to put that document into evidence. In those circumstances, the party is faced with the hard choice of either foregoing reliance on the document or submitting the document and seeking a court order placing the document under seal or closing the related proceedings. Choosing the latter path unavoidably entails risking the possibility that the court may find that the strict standards for sealing judicial documents or closing proceedings have not been met. But when a party chooses *not* to rely on documents or other confidential information in court, the fact that the information is sufficiently relevant to the proceedings that it *could* have been introduced into evidence does not entitle the press or public to demand access to it or to put courts to the burden of evaluating whether the strict standards for rebutting the presumption of public access have been met. It makes no difference in this regard whether the party initially devised such a strategy or adopted it at the suggestion of the district court; the choice remains that of the litigant.

Finally, the fact that the Report "was already part of the record in connection with obtaining the protective order" (Concurring opinion, post, at 1), cannot change the analysis. A document cannot become subject to a presumption of public access by reason of the parties' efforts to keep it confidential during the discovery process.

First Amendment right attaches.  There is thus no presumption of public access to the Report, and the district court was well within its discretion in declining to unseal it.

## CONCLUSION

Accordingly, we conclude that the district court erred by declining to order release of the full transcript of the contempt hearing, but that given the minimal relevance of portions of the Report that were not testified to at the contempt hearing to the substance of that proceeding, the Report did not become a judicial document to which the First Amendment right applies.  We therefore AFFIRM as to the Report, REVERSE as to the hearing transcript, and REMAND for further proceedings consistent with this opinion.

LOHIER, *Circuit Judge*, concurring:

Based on the record in this case, I conclude that the IAU Report prepared by the police department's internal investigation unit is a judicial document entitled to a presumption of public access. Even so, the balance of interests counsels in favor of keeping the Report sealed.

Here, the parties offered to submit the Report to the District Court for its review; indeed, the Report was already part of the record in connection with obtaining the protective order. Joint App'x 374-75, 390. But the District Court decided instead to have a witness testify about the contents of the Report. In my view, the court's efforts were not enough to transform the Report into something other than a judicial document, which we have variously described as an item that "must be relevant to the performance of the judicial function and useful in the judicial process," United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995) ("Amodeo I"), or the contents of which are central to the court's determination of a party's "substantive legal rights," United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995) ("Amodeo II"); Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 121 (2d Cir. 2006). Keeping that description in mind makes it relatively easy for me to conclude that the Report is a judicial document: although it was never

filed, its contents were central to the District Court's determination of Schmitt's "substantive legal rights" in the contempt proceeding.  See United States v. Graham, 257 F.3d 143, 151-53 (2d Cir. 2001) (common law right of access applies to documents "relevant to the performance of the judicial function and useful in the judicial process," regardless of "whether they were formally admitted as evidence" or filed).

That the District Court never directly reviewed the Report hardly negates this conclusion, any more than ignoring an elephant in the room eliminates the elephant.  To the contrary, the court's efforts to avoid "relying" on the Report by not reading it simply underscore why the Report is a judicial document.  During the contempt proceeding, the parties referenced the Report, while Assistant Chief Neil Delargy, a significant witness during the hearing, reviewed the Report to refresh his recollection and then testified about the Report's contents.  In short, based on Amodeo I and Amodeo II, I have a hard time viewing the proceeding as adjudicating whether Schmitt's disclosures were based on the Report without relying on part of the Report itself to do so.  As the majority opinion acknowledges, "the entire contempt proceeding was, in some sense, about the Report."  Majority Op. at 24.

Although, as a judicial document, the Report should have triggered a presumption of public access, that does not end the story. There remains a concomitant need to balance competing interests before the Report can be unsealed. On this point, although the District Court did not engage in this precise balancing test, I believe we are equipped to engage in it ourselves based on the developed record. The balance of relevant interests involves, on the one hand, the public's interest in having the information it needs to "monitor[] the federal courts" in their exercise of Article III judicial power, Amodeo II, 71 F.3d at 1049, and, on the other hand, the law enforcement privilege and individual privacy interests, id. at 1050-51; Amodeo I, 44 F.3d at 147. Like the majority, I am persuaded that the public's interest in scrutinizing the District Court's contempt determination is only very minimally furthered by releasing the Report, particularly since the hearing transcript will now be made public. In this regard I note that sealed law enforcement reports historically have not been made public merely to facilitate scrutiny of a judicial determination of whether someone disclosed their contents in violation of a court's protective order. See Amodeo II, 77 F.3d at 1050 ("[T]he weight to be accorded to the presumption of access" is "stronger" for documents that "are usually filed with the court and are generally available" and weaker where they are "generally under seal."). I doubt,

moreover, that the District Court could have meaningfully redacted this particular Report. See Amodeo II, 71 F.3d at 1052-53. Because neither "experience" nor "logic" counsels in favor of publicizing the Report, see Lugosch, 435 F.3d at 120, even though it is a judicial document, I agree that it should remain sealed and would affirm the District Court's judgment on that basis.

For this reason I concur in the result.